UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

THIERNO D. BAH,

                    Plaintiff,                    14 Civ. 1393 (RWS)

         -against-                                OPINION

EVERLAST LOGISTICS, LLC, EVERLAST
TRANSPORT, LLC, and SEALAND a/k/a
SEALAND TERMINAL CORPORATION, and
GRESPANIA S.A.,

                    Defendants.
------------------------------------X

A P P E A R A N C E S:


          Attorneys for Plaintiff

          JEFFREY J. SHAPIRO & ASSOCIATES, LLC
          675 Third Avenue, Suite 3005
          New York, New York 10017
          By:  Steven E. Millon, Esq.


          Attorneys for Defendants

          BIEDERMANN HOENIG SEPREVIVO
          One Grand Central Place
          60 East 42nd Street, Suite 660
          New York, New York 10165
          By:  Joseph Kim, Esq.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-26-19

1

**Sweet, D.J.**

Defendant Grespania S.A. ("Grespania" or the "Defendant") has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment to dismiss the complaint (the "Complaint") filed by Plaintiff Thierno Bah ("Bah" or the "Plaintiff"). This is a personal injury action arising from a workplace accident that occurred on April 11, 2013. Based on the facts and conclusions set forth below, Defendant's motion for summary judgment is granted, and the Complaint is dismissed with prejudice.

## I. **Prior Proceedings**

Plaintiff commenced this action in the Supreme Court, County of the Bronx on November 11, 2016. Plaintiff alleges that he suffered personal injuries arising out of an accident that occurred on April 11, 2013 as he unloaded boxed tiles from a shipping container alleged to have been negligently loaded by Grespania (the "Container"). The action was removed to this Court on March 3, 2014. (*See* Dkt. No. 2.) Plaintiff filed a first amended complaint on December 12, 2014, (*see* Dkt. No. 15), and a second amended complaint on February 10, 2016, (*see* Dkt. No. 38). Meanwhile, discovery proceeded.

2

Grespania's instant motion for summary judgment was heard and marked fully submitted on February 7, 2018.

## II. The Facts

The facts have been set forth in Defendant's Local Rule 56.1 Statement, (see Dkt. No. 74) and Plaintiff's Local Rule 56.1 Statement, (see Dkt. No. 67) and are not in dispute except as noted below.

Defendant Grespania is a manufacturer of ceramic tiles, based in Spain, which sells its products internationally, including in the United States. Defendant loads approximately 3,640 shipping containers per year, and uses the same practice and procedure to load all containers, as described below (the "Procedure"). Plaintiff denies that the Container he was unloading on April 11, 2013 was so loaded.

To begin, customers' purchase orders are sent to Defendant's "area manager" and his administrative assistant. Once the purchase order is received, a document called a "commercial pro forma" is created and sent to the client for confirmation. After the client confirms the order, the client also confirms which transportation company it will use. Upon

confirmation of all details, Grespania's cargo procedure is initiated, and a cargo order is sent to Grespania's warehouses and assigned to warehouse personnel who prepare the order for pick-up. Defendant has two warehouses—one in Castellon, Spain, which stocks floor tiles (the "Castellon Warehouse"), and a second in Nules, Spain, which stocks wall tiles (the "Nules Warehouse").

When Grespania receives an order for a U.S. customer, the requested product is taken from one or both warehouses; the product is not specifically manufactured for the customer. Grespania's goods are palletized at Grespania's warehouses. Defendant's entire process of palletizing its products has been automatic since the late 1980s. The machines used today have been in use since 2008. The goods are loaded onto pallets by an automatic packing machine called "Falcon," produced by the company System Ceramics.

Next, pursuant to its Procedure, Grespania applies anywhere between four and eight plastic belts on each pallet to keep the boxes of tiles affixed to the pallets. If a plastic belt is applied with insufficient pressure, or if there is a box that is not aligned, an alarm rings and the production line is halted until the non-conformity is corrected. Grespania uses

4

plastic shrink wrapping technology at both of its warehouses, although the method of application differs. At the Castellon Warehouse, the plastic shrink wrap is applied as a bag, and then a machine circles the pallet while shrinking it down. At the Nules Warehouse, the plastic shrink wrap is applied in sheets to the pallets in a tunnel system.

Once a particular order is ready, an independent truck driver, selected by the customer, brings an empty shipping container to Grespania's warehouse and opens the container. Shipping containers are of standardized dimensions, generally coming in lengths of 20 or 40 feet. The width and height of these containers is always the same. Pursuant to its Procedure, Grespania loads its containers so that pallets are as low to the ground and as evenly distributed as possible to minimize the possibility of damage to cargo should any of the contents shift or fall during transport.

Next, warehouse workers load pallets onto each container using a "Hyster model H2.5FT" forklift. Grespania requires that its workers receive training and licensing prior to being allowed to operate forklifts. According to the Procedure, stacks of pallets are placed against the walls of the container such that a walkway wide enough for workers to

5

navigate within the containers remains between the pallet stacks. Workers use this walkway to allocate airbags throughout the container. The warehouse manager then ensures that the cargo is properly loaded and secured in the containers.

Next, the truck driver seals the container, and the loaded truck is weighed on a scale. The truck driver verifies a document called the "albaran," or "new cargo confirmation," and Grespania creates a "bill of lading" document. Grespania's palletization, warehousing, and cargo loading process is subject to regular audits and is certified by the International Organization for Standardization ("ISO"). Grespania was ISO certified during the time period covering the underlying incident.

Once the container is sealed and taken by the customer's chosen trucking company, Grespania has no further control over it. Grespania maintains no practice or custom of instructing, inspecting, approving, supervising, or even inquiring about the container unloading practices of its customers. As such, Grespania generally assumes that its customers know how to competently unload their containers.

Plaintiff was employed by Quality Tile Corporation in Bronx, New York, as a warehouse worker for approximately one year at the time of the alleged April 11, 2013 accident. He did not receive any training, written materials, or instructions on how to unload containers during that time. Quality Tile did not have a loading dock or any ramps for loading/unloading shipping containers. In order to unload containers, Quality Tile's workers place a pallet jack under the bottom-most pallet in a stack, jack it up off the floor, and then connect a cord from the handle of the pallet jack to the forklift. The forklift operator then backs up the forklift to drag the pallet jack carrying the stack of pallets to the container opening. The pallets are then removed by the forklift at the edge of the container—first lifting off one pallet, and then the remaining two pallets.

Plaintiff's only role in unloading the Container was to insert the pallet jack under a stack of pallets, to jack the load up and off the ground, to attach the cord running from the forklift to the pallet jack, and then to get out of the way of the forklift operator. This was the only 'procedure' for unloading a container that Plaintiff knew. Plaintiff and his co-worker, friend, and fellow countryman Diallo were aware that their work was dangerous, and that regularly conversed with each

other about the dangers of their job and warned each other to be careful prior to the accident.

Here, the Container bound for Quality Tile (No. FCIU3336616) was a "20 foot" container, meaning that it was 20 feet long with an exterior width of 8 feet and an exterior height of 8.5 feet, and an interior width of 7 feet 8 inches (92 inches). The Container first went to the Castellon Warehouse, was partially loaded, then went to the Nules Warehouse for the remainder of the order. The goods to be loaded into the Container were pulled from the warehouses and set aside for loading on the day prior to pick up. The Container was the only container delivered to Quality Tile on the date of the accident.

According to Grespania, it loaded the Container, and all the pallets within it, in accordance with its Procedure, such that there were 10 total stacks of pallets, each stacked 2 pallets high, except for the stack furthest away from the Container's opening, which was stacked 3 pallets high, for a total of 21 pallets. Contrarily, Bah testified that the Container was loaded to the doors with approximately 5 rows of pallets, each row being 3 pallets across and 3 pallets high for a total of 45 pallets. The net weight of the Container was 20,650 kilograms ("kg"), which Grespania takes to mean that each

of the alleged 21 pallets weighed approximately 1,000 kg. Bah
denies that the pallets were loaded as described, and asserts
that the top pallet that fell on him was not as full as the
other pallets.

At the time of the April 11, 2013 accident, Plaintiff
had been working two full-time jobs—a security guard job through
Maximum Security Investigations, and his warehouse job at
Quality Tile. The night before the accident, Plaintiff worked
the nighttime shift at his security job and then walked down the
street directly to Quality Tile at 8 a.m. to start his daytime
shift.

At approximately 12:00 p.m., a truck pulling the
Container parallel-parked in front of the main entrance to
Quality Tile's Merritt Avenue warehouse ("Merritt Avenue
Warehouse") in the Bronx. While Bah did not see the opening of
the Container's doors, immediately after the doors were opened
he did see that the Container was packed up to the edge of the
opening, and that the stacks of pallets visible to him were all
standing. After the Container door was opened, Quality Tile's
forklift operator, Ila, offloaded the row of three pallets
closest to the door by way of his hi-lo forklift machine. After
one or two rows had been removed, Bah, Diallo, and a manual

pallet jack were lifted up on the forks of the forklift and into the Container to assist with unloading the container in the previously described manner.

The accident occurred while Bah was unloading a pallet from the third row of pallets. Plaintiff inserted the forks of the manual pallet jack into the left-most stack of pallets in the third row, jacked the load up and off the ground, and attached a cord from the handle of the manual pallet jack to the forklift, and then moved out of the way to the right. The forklift drove backwards 5-6 feet to drag the loaded pallet jack to the opening of the Container, and then came to a complete stop, creating a space behind this stack of pallets and the fourth row of pallets behind it. Plaintiff knew that the forklift driver would frequently stop while dragging pallets, although he did not know why. Plaintiff stepped into the space created behind this stack of pallets after it stopped. It was then that Bah noticed that the top pallet on this stack did not appear to be aligned with the bottom pallets. Plaintiff saw that the top pallet was shrink-wrapped, and that there was no damage to the plastic prior to the accident. However, Plaintiff denies that there were any plastic belts, air bags, or bracings that might secure the boxes to the pallets and prevent the load from shifting within the Container.

A few seconds later, this top pallet fell on Plaintiff. Specifically, Plaintiff alleges that the boxes on the top pallet came loose from the plastic wrap and fell on him. According to Bah, the pallets were not loaded so as to be evenly distributed in the Container. Grespania asserts that the Container was loaded in adherence to the Procedure. Bah alleges that he noticed that before the top pallet fell, it was bigger than the two pallets below it, not evenly aligned or centered with the pallets below it, and not evenly loaded with boxes.

At that moment, Plaintiff instructed Diallo and Ila to tie the cord to the pallet that was on top of his left leg and back up the forklift to drag the pallet off of his leg. Plaintiff was then left alone in the Container screaming and crying for up to an hour. During this time, Plaintiff saw the boxes that had fallen on him and he was sure that the words "CERACASA" were written on the boxes through the clear shrink wrap.

Because his co-workers and supervisors neglected to call an ambulance for him, Plaintiff ultimately had to call 911 himself to request an ambulance.

## III. **The Applicable Standard**

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine issue of material fact*."
*Anderson*, 477 U.S. at 247-48 (emphasis in original).

## IV. **The Defendant's Motion for Summary Judgment is Granted**

The Plaintiff alleges a single claim of negligence
against Grespania. "To succeed on a negligence claim,
plaintiff[] must establish the following elements: (1) duty; (2)
breach of duty; (3) proximate causation; and (4) damages."
*Giuffra v. Vantage Travel Serv., Inc.*, No. 13-cv-6880, 2015 WL
3457246, at *3 (S.D.N.Y. June 1, 2015). Any duty that Grespania
owed to Plaintiff was to exercise reasonable care in loading the
Container. *See, e.g., Patalano v. Am. President Lines, Inc.*, 322
F. Supp. 2d 293, 296 (E.D.N.Y. 2004), *aff'd Patalano v. Am.
President Lines, Inc.*, 250 Fed. App'x 425 (2d Cir. 2007)
(holding that owner of shipping container owed longshoremen "the
ordinary negligence duty of reasonable care under the
circumstances"); *Sinagra v. Atl. Ocean Shipping, Ltd.*, 182 F.
Supp. 2d 294, 300 (E.D.N.Y. 2001) (quoting *Fed. Marine
Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17
n.18 (1969)) (internal quotations omitted) ("[T]he vessel is
expected to exercise ordinary care in surrendering 'its
equipment and appliances in such a condition that an expert and
experienced stevedoring contractor, mindful of the dangers he

13

should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.'"); *Pierce v. Cub Cadet Corp.*, No. 87-5936, 1989 WL 47446, at *4 (6th Cir. May 9, 1989) ("Only if and when a shipper assumes the responsibility for loading its property on a motor vehicle, does it have the duty to exercise reasonable care to see that the load is properly secured.").

Here, all of Grespania's palletization, warehousing, and cargo loading procedures were compliant with industry standards and performed with reasonable care. Grespania's palletization, warehousing, and cargo loading processes are subject to regular audits and are ISO certified; further, Grespania was ISO certified during the time period covering the alleged incident. Moreover, it is undisputed that when the doors of the container were opened in front of Quality Tile's warehouse, all stacks of pallets were seen to have remained upright, despite having crossed an ocean, and having further traveled over land by truck.

Plaintiff himself provides that the top pallet was stable until he lifted it with the manual pallet jack. Specifically, Plaintiff testified that the stack of pallets was

14

"stable" after he inserted the forks of the manual pallet jack
underneath the stack and lifted it:

> Q. You say you use the hand jack to put the forks of
> the hand jack underneath the pallet and then lift
> the pallet up to the point where it's off the
> floor of the container; correct?
> A. Yes, mm-hmm.
> Q. From that point, how is that pallet moved? Tell me
> how that works.
> A. Okay, after I finish doing that, everything was
> stable and I moved away.

(See Bah Tr. 44:13-22, Nov. 5, 2015, ECF No. 70-3.)

Plaintiff further testified that the stack of pallets was

"completely stable" until after it was dragged. (See id.

101:21-25.) In his opposition papers, Plaintiff admits that

he saw that the top pallet "was not stable", "wasn't

straight", and "wasn't properly centered on the stack" only

"after he stepped back while it was being moved." (See

Millon Decl. at 3, ECF No. 73.)


Plaintiff also testified that Grespania wrapped the

pallets tightly with clear plastic wrap, and that the purpose of

this was "to maintain the boxes . . . tight." (See Bah Tr.

107:7-108:6, Nov. 5, 2015, ECF No. 70-3.) In his deposition,

Plaintiff stated the following:

> Q. So every pallet full of boxes had clear plastic
> wrap on it?
> A. Clear plastic wrap.
> Q. What is the purpose of the clear plastic wrap?

15

```
        A.    For me, I think, it's to maintain the boxes,
              like, tight, to keep tight.
        MR. MCGOVERN: Was the plastic wrapping each individual
              box or was it wrapping the boxes together?
        THE WITNESS: No, the whole pallet.
        Q.    Describe the plastic for me.
        A.    You know, those are the roll they use in the
              warehouse to wrap. You know, you unroll it around
              the pallet to tighten it. That's the kind of
              plastic wrap.
        Q.    Is that, like, shrink wrap?
        A.    Shrink, yeah.
        Q.    Did you notice any of the plastic damaged in any
              way prior to your accident?
        A.    No.
```

(*See id.*)

        Further, according to the undisputed facts, Plaintiff

acted in violation of industry standards in the moments leading

up to the accident, suggesting that his actions, rather than

those of Grespania, created the risk of the accident here.

According to shipping and transportation industry standards, it

is not safe to use a motorized vehicle, such as a forklift, to

tow or drag a heavily loaded manual pallet jack when unloading

pallets from a shipping container. (*See* Fields Report at 4.) Any

load lifted with a manual pallet jack should remain under manual

control only, and should not be towed by another vehicle. (*See*

*id.*) Indeed, it is dangerous to use a motor vehicle to pull a

heavy, stacked load that is on wheels by means of a cord because

of the likelihood that one will lose control over that load.

(*See id.*) Starting and stopping while dragging further adds to

the danger, because it can contribute to shifting of the pallets being dragged. (*See id.*)

On the day of the accident, Quality Tile's forklift operator successfully removed the first two rows of pallets solely by using the forklift. Only after Plaintiff and his coworker, Diallo, were lifted into the Container on the forks of the forklift and started unloading the Container's contents using the towing method as described above did the pallet fall. To unload the Container, Plaintiff inserted the forks of a manual pallet jack under the left-most stack of pallets in the third row of the subject container, jacked up the pallets and proceeded to attach a cord from the handle of the pallet jack (located inside the Container) to the forklift (located outside the Container). Plaintiff testified that he then moved to the right to a position of safety. The forklift drove backwards 5-6 feet, dragging the loaded pallet jack to the opening of the Container. The forklift came to a complete stop. The dragging of the pallets created a space behind this stack of pallets and the stack of pallets behind it. Plaintiff stepped into the confined space directly behind the stack of pallets being dragged. It was only then that Plaintiff noticed that the top pallet was not aligned with the bottom pallets. A few seconds later, Plaintiff saw this top pallet falling towards him.

As a matter of physics, if the pallets were going to fall, they would fall opposite the direction they were being pulled. (*See* Fields Report at 5) ("Since every action has an equal and opposite reaction, if the pallets were going to fall, the risk was that they would likely fall in the direction opposite to the direction they were being pulled."). Therefore, this was the single most dangerous spot to be during this procedure. (*See id.*) That is where Plaintiff decided to place himself.

Finally, the Plaintiff submitted the affidavit of Robert Genna ("Genna") as a "forensic consultant." (See Genna Aff., Ex. 4, ECF No. 75-4.) However, the Genna affidavit ("Genna Affidavit") is rejected. Pursuant to Federal Rule of Civil Procedure 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Plaintiff did not designate or disclose Genna as an expert witness, and Plaintiff's time to do so expired on November 30, 2017. (*See* Order, Oct. 30, 2017, ECF No. 60.) The

deadline to exchange expert reports was extended, in part, upon Plaintiff's own request, *see id.*, and Plaintiff used this extension to disclose his expert orthopedic surgeon Dr. Gabriel L. Dassa on November 6, 2017. Plaintiff did not disclose any other expert.

This Court, under similar circumstances, has declined to consider expert affidavits submitted for the first time in opposition to summary judgment motions. *See, e.g.*, *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607-08 (S.D.N.Y. 2004); *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 376 (S.D.N.Y. 2003); *F.D.I.C. v. Wrapwell Corp.*, No. 93 Civ. 859 (CSH)(KNF), 2000 WL 1576889, at *2-3 (S.D.N.Y. Oct. 23, 2000); *Horowitz v. Jacoby Moving & Storage, Inc.*, No. 99 Civ. 9798(AJP), 2000 WL 382063, at *4 (S.D.N.Y. Apr. 14, 2000); *R.C.M Executive Gallery Corp. v. Rois Capital Co.*, No. 93 CIV. 8571 (JGK), 1996 WL 30457, at *1-2 (S.D.N.Y. Jan. 25, 1996).

In addition, the Genna Affidavit fails to comply with the disclosure requirements of Rule 26, *see* Fed. R. Civ. P. 26(a)(2)(B) (listing the requirements of expert reports), as no copy of Genna's curriculum vitae ("CV") is included. (*See* Genna Aff., Ex. 4, ECF No. 75-4.) Further, even assuming Genna is an expert in the field of "forensic science," nothing in his

19

affidavit qualifies him to opine on the practices and standards of the shipping and transportation industries. *See Nimely v. City of New York*, 414 F.3d 381, n.13 (2d Cir. 2005) ("[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.")

Moreover, the Genna Affidavit is conclusory, based on the Plaintiff's allegations, and bears no independent or scientific analysis. *See Matthews v. Hewlett-Packard Co.*, No. 15 Civ. 3922 (DAB), 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (citation omitted) ("In fact, [the expert's] opinion on causation appears to be based on little more than Plaintiff's own opinion on this issue, without the benefit of any additional or independent analysis. The Report's bald repetition of Plaintiff's beliefs as to the cause of his condition simply does not reflect a methodology reliant upon Dr. Bryant's specialized knowledge or experience, and thus, cannot be considered reliable."); *Hernandez v. Leichliter*, No. 14-CV-5500 (AJN), 2016 WL 684038, at *2 (S.D.N.Y. Feb. 28, 2016) (citations and internal quotation marks omitted) ("To the extent [the expert] merely repeats or recasts the testimony of Plaintiff in order to arrive at a theory of causation, he is not testifying as an expert witness based upon specialized knowledge, but rather is

acting as a conduit for another witness's testimony in the guise of an expert's opinion."). Accordingly, no evidence has been submitted to establish negligence on the part of Grespania.

In sum, because Grespania's Procedure for loading the Container was reasonable, and in the absence a "genuine issue as to any material fact," Defendant is "entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c).

## V.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted.

It is so ordered.

**New York, NY**
**March 2018**

_____
ROBERT W. SWEET
U.S.D.J.